Your Honor, and may it please the Court, I want to emphasize three decisions in this area that really emphasize that the District Court's decision was incorrect. The first one is Marshall v. Georgia Southwestern College, which specifically approved comparisons between professors teaching in different academic departments at an institution that was similar to Virginia State University in the sense that it was a teaching institution where instruction of students and not research was the primary responsibility for faculty members. And in that case, the university argued that exactly like Virginia State did here, that it was inappropriate to compare professors across Just so we're clear, this is the 1980 Middle District of Georgia decision. Correct. That was affirmed in relevant part by the 11th Circuit to the extent that we're relying on it. And the university argued to the 11th Circuit and to the District Court that this comparison was inappropriate, and the 11th Circuit rejected the argument that one of the professors was an improper comparator because he taught in the administration area where the other guy taught education courses, that we do not find this difference compelling. Virtually all teachers in a higher education setting will teach different courses. In this case, like in Marshall v. Georgia Southwestern University, we have sworn testimony from both the plaintiff and her two comparators that they perform substantially similar job responsibilities on a day-to-day basis. You started off with a decision from the Middle District of Georgia, but what about our own precedents, both in Strang and Sobel? Yes. And the Strang decision says a male professor hired to teach in a department other than the one in which the plaintiff was employed did not constitute a proper male comparator. But different departments and different universities require distinctive skills. Much about this case, it's simply a matter of whether we're going to follow a certain precedent or whether we're not. I think that Strang and Sobel were careful not to lay down a hard and fast rule that comparisons across departments were never, ever appropriate. Well, they didn't say never, ever, but it's a person hired to teach in a department other than the one in which the plaintiff was employed did not constitute a proper male comparator because different departments and universities require distinctive skills. And these departments are very different departments. And again, it's a question of whether the circuit precedent means anything or whether it doesn't. I think that with respect, in Strang, there were discipline-specific qualifications that were at issue. In this case, the comparators did not possess the terminal degrees in their own subject field. There's a significant difference because that was a required qualification under the university's written policies. So there's no, the language from Strang and Sobel about hyper-specific qualifications pertaining to academic departments doesn't apply where you have somebody who had literally no teaching experience called up the week before classes started and said, hey, you're going to this department. I think the rule is a wise one. It's a different question from whether their jobs require equal skills. And, you know, you have Shackelford and Dial doing different things. You're not, you just can't compare oranges and apples and say, well, they're the same. Well, they testified under oath to a very specific list of 12 specific tasks that they performed routinely under oath. And they also testified. But isn't it also fair that every high school teacher would testify to doing basically those same things? Maybe even elementary school teachers would testify to doing basically those same things, right? Creating a syllabus, doing lesson planning, supervising students, discussing their life plans. I mean, the level of generality that you had them testify to would encompass every teacher at every level. And I presume you don't agree that high school teachers or middle school teachers were appropriate comparators. No, because the Equal Pay Act talks about equal skill, effort, and responsibility. So none of those were part of the skill, effort, and responsibility. But you asked them to testify to these 11 factors that you talk about. You had them testify to them at such a level of generality that they equally apply to high school teachers, right? That's why those aren't helpful to us at all. Well, the fact, the common core of duties, of shared job duties, is not the be all and end all. It is a factor that goes to whether the two jobs are substantially equal. But, for example, high school teachers... No, but our precedence is you cannot approach it. It's, again, a question of circuit precedent. And our precedence is you can't approach it from 30 feet, 30 feet up in the air. Well, the... But it gets back up. All professors, all professors teach classes. They interact with students. They grade papers. But our precedence is that doesn't make for equal skills. If it did, we'd be setting the salary levels across the university. It would get us into the salary... We would essentially become university deans. Well, that takes you to the second... To the other... Let me give you the comparison. How do you get around the 75% rule? Well, that goes to the affirmative defense, the EPA affirmative defense. I think the issue is whether we... The first issue is whether there's a question of material fact as to whether they perform substantially equal job duties. Now, the fact is there's no way to phrase the test in such a way that it... You have to take the specific discipline into account. We'd also say that you can't compare between high school teachers teaching different subjects. You can't compare between elementary school teachers teaching different subjects. That's the factor that Virginia State says is missing and that you're saying is missing, is that, well, they were teaching in different... They were doing all these things. I think this, from your case, is that these differences are explainable for all kinds of reasons other than gender. Number one, they're different departments. But as Lieutenant Chief Floyd alluded to, there's a 24 or there's a 9-12 rule. You may not like it. You may not think it's reasonable. But it's applied across the board. It's applied to former administrators who are female as well as former administrators who are male. And... That's a key... What I'm saying is that rule, that some variation of that 9-12 rule is in place in practically every university in the country in this sense. That when you recruit top administrators, they want to know what kind of landings they're going to get once their administrative tenure has expired. And they want to say, well, what's my salary going to be after that? And if you say, well, you're going to take a 50% drop, the administrator is saying, well, goodbye. I'm not going to sign on with the university. So something like this 9-12 program is in place in practically every university. The contracts of university administrators have provisions standardized very often in the way Virginia State has done here that provide for some kind of gender-neutral landing after the administrative term expires. And that is not a gender discrimination issue. Right. So that is a policy. I agree with you that that's a policy that many universities have. However, that was not the policy. Usually how it works is that when you're hired as an administrator, especially in an academic position, you say, I am becoming a tenured faculty member because I want to know that if I'm fired as an administrator, that's something that's negotiated. And the testimony in this case is the same. This is something that's negotiated at the time of hire. What's unique about this case is that these — that was not negotiated at all. There was no discussion of that whatsoever when these individuals were hired as administrators. So the point — so this was not an application of the policy you described. What had happened in this case is that they are hired as nonacademic administrators. It's not common at any university to hire nonacademic administrators as tenured faculty members. It just isn't. So then — so they're hired without tenure as nonacademic administrators. They are terminated. And then as an act of friendship, they are transitioned to the faculty. All right. But that's simply saying you disagree with Virginia State's choice to place them in the 912th bucket. They put them in the 912th bucket for whatever reason. No. I respectfully disagree because it violated their own policy, their written policy. There was no written policy about that. But it doesn't matter if they violated their own policy. That's not our problem. Like, that's what they believe their policy to be. Well, it's an issue — We're not here to interpret their policy. That's their policy. They're saying they followed it. But for the purposes of the EPA affirmative defense, as this Court made very clear in the EEOC versus Maryland Insurance Administration case, if there is an element of discretion in applying — and in this case, there was nothing but discretion in applying this policy. Nothing but. In the EEOC versus Maryland Insurance Administration case, the fact rather than sex, if there's an element of discretion in applying it, then that raises a genuine issue of material fact as to the affirmative defense. That's right there. There's no way to read EEOC versus Maryland Insurance Administration without taking that away. The policy at issue in Maryland Insurance Administration was — See, one of the problems you're, I think, running into here is that you're describing pay differential as gender-laden when they're due to market forces. And you're reading out the role that market forces play in university pay. Because people who are medical professors or law professors or this or that, there are all sorts of demands for those jobs that differ and create market differences in pay. And, you know, what is weak about this? This case is weak in so many respects. Your own witness testified that there's no statistical evidence of pay discrimination at Virginia State. But that's another — The university has responded to the Gender Equity Task Force on its own. Didn't need a lawsuit to prompt them to do that. And they replied this 9-12 rule to people who were previously top administrators, which would seem a normal application for somebody. It would seem a normal application of a 9-12 rule for somebody that was at that level of administrative position at VCU. With due respect — At Virginia State. Right. So with respect to whether we're taking into account market forces or not, we have an entire expert report that takes into account length of service on the faculty. It takes into account department taught. And it takes into account whether there is a chair professor. Indeed, it finds that they were overwhelmingly overpaid with respect to the normal factors that Virginia State looks to in terms of hiring. So there's no question that — Well, that assumes the affirmative defense, essentially. It affirms that there was — this was a proper — there was some policy — If you remove the reason given for their salary, you find something different. Well, there was no policy that would apply to them. There was certainly no nondiscretionary policy that passes muster under the Beryl and Insurance Administration case. Certainly not that. These were new hires. They were not given tenure at the time that they were appointed as administrators, which is how it works at every university. When you hire administrators with tenure and you have them retreat rights, it's given at the time that they're hired as administrators. It's not something where they are terminated as nonacademic administrators and then given the option to newly join the faculty at inflated salaries. That's pay discrimination. He's seeking to draw us into the minutiae of how every university professor is paid and the degree to which they compare to some other professor in some other department. And we are going to go into all of that with cross-departmental pay. This really is at the end going to displace university administrators with judiciary's philosophy of comparative worth. And I can't imagine a lawsuit that would draw judges more deeply into university administration. And that is what our precedent was seeking to guard against in Stregel and Sobel. The very thing that you're seeking to draw us into. There are no doubt equal pay act, it doesn't require discriminatory intent. There are no doubt equal pay act causes of action that will have a place. No question about that. But this one, given the differences in the job detail, given the 24-7 rule, given your own plaintiff's testimony, given our circuit precedent, this case is singularly weak and requires us to make broad leaps across departments and this and that. Your Honor, with all due respect, this was the Maryland Insurance Administration case which involved a written, we are talking here about an entirely unwritten policy where you have the provost testifying that this was done as an act of friendship to the terminated administrators. You have absolutely no written policy. In fact, you have a written policy that contradicts what they did specifically. You have absolutely, you are saying that universities can get away with anything. They can say to a man, okay, you're our friend, we're going to give you a job. I'm not saying anything remotely. Not even close. Totally misconstruing what I just said. Well, the practical effect would be, though, would be to allow the courts to get into these sorts of, would be to allow universities to do these, to give jobs with no policy justification, no result. I think this sucks us in deep. At any rate, you do have some rebuttal time, and we'll be pleased to hear from you then. Thank you. Mr. Robinson, let's hear your side of the story. May it please the Court, good morning, Your Honors. My name is Jimmy Robinson, and along with Elizabeth E. Banks and Kyle Elliott, we represent the appellees, Virginia State University, and Dr. Keith Miller is former president. We believe that Judge Hudson got it right, and we do believe that this is a singularly weak case, as you have indicated. I'll start, not where I thought I would start, but I'll start with the issue of the 912th's rule. Plaintiff indicated that this was an unwritten policy, but he indicates it was, in fact, a policy. It was Virginia State's policy. You rightly said whether he liked it or not, whether Spencer liked that policy or not, that was the policy that if administrators were moved into faculty positions, that those administrators would receive 912th's, 75% of their salary. That's because they were no longer working 12 months out of the year. They were only working 9 months out of the year. What's majorly important here is that the evidence in the record shows that the plaintiff herself admits that, that Ms. Spencer, in her response brief, admitted that Provost Heal set the pay of Dial, Cortez Dial, Dr. Cortez Dial, and Michael Shackerford using that unwritten policy. Plaintiff also indicated in their oral argument that that policy violated Virginia State's rule. That is not the case. What plaintiff was suggesting that when you hire new professors, that you try to make sure that those new professors are hired somewhere similar with their department salaries. These weren't new professors that were being hired. These were individuals who were administrators, highly paid administrators admittedly, but administrators nonetheless that were being transferred out of administration down to the faculty. And they certainly were entitled to that amount. With respect to the case that's really before us is whether or not Zoe Spencer met her prima facie case in establishing that there was discrimination under the EPA, the district court got it right. She did not meet her prima facie case. She did not identify proper comparatives. She did not identify males that were making more than she was, that were performing work substantially equal in skill, in effort, and in responsibility. She seems to skip over the fact that they have to be substantially equal in skill, effort, and responsibility. This course through his questioning this morning has indicated that the functions being done by Cortez Dial in the Mass Communications Department and Michael Shackerford in the Educational Leadership Department were distinctively different than that that was being provided by Ms. Spencer in the Sociology Department. She in fact admitted it. She provided no evidence that her experience was any different than her experience was different. She didn't say that her job was distinctive or similar to Shackerford's and Dial. She said that she only worked 30 hours a week. Michael Shackerford, the evidence said that I have to work 50 or 60 hours a week from 9 to 12 because I'm in charge of this internship program, that I'm meeting with students doing their dissertation. I'm trying to assist them in trying to figure out what they're going to write about or what their panel is going to be. Cortez Dial is in charge of the internship program, and his internship program was pairing with minor league baseball teams to make sure that the communication department was promoted out into the community. There was distinctive functions that these individuals were doing that Ms. Spencer admits that she was not. What Ms. Spencer tries to do is just do this umbrella that this court has rejected in Stragg and Sobel and Wheatley that says everybody teaches, everybody does syllabi, everybody does this common core of duties and responsibilities, and because of that I think we all should be paid the same. Interestingly enough, she doesn't bring in as her comparators those men in her department. There were both men and women in her department that made more than she made, and that made less than she made. Her own expert tells us why she didn't bring those as comparators. It's because there was no pay disparity at Virginia State University. Now Michael Shackerford and Cortez Dial certainly were paid more than Ms. Spencer, but they were paid more than most anyone at the university. Both male and female. That's what we had in the Stragg case. That they were paid, that that particular employee was paid more than anyone at the university, at that community college. And so for that reason, the plaintiff in Stragg said, well I think that I should be paid the same. And the court says no, you have to establish evidence that your duties and responsibilities in teaching your courses and your discipline is similar or equal to the skill, effort, and responsibility as your comparator. If you have a finding that the plaintiff in this case deserved a raise, then I'm not going to throw the salary structure into turmoil. And there's going to be male plaintiffs out there that would bring a suit and say, wait a minute, I've got, I'm performing duties of equal skill and responsibility to the person here that got a raise even though I'm in a different department. I've got an equal pay act suit. In other words, you would scramble the salary picture to such an extent that you would give rise in different departments to other pay inequity claims. Absolutely, Your Honor. There's litigation just lining up outside the door to say that this individual was treated more favorably because of her gender. And there would be male plaintiffs lining up with their lawsuits. And goodness knows what kind of things you'd have to defend against. Absolutely, Your Honor. And that, in fact, was the consideration. Plaintiff's theory of her case, this faulty theory, would have the absurd result that VCU would be required, Virginia State University would be required, to increase the salaries of plaintiff and all other female members to match those of Shackelford and Dye. But what about the males? What happens there? Then they would have an EPA claim saying that Ms. Spencer was being paid more unfairly. I mean, that's the problem. If you really take leave of the statutory language and the equal skill and everything and courts start re-scrambling and reconstituting these salaries, then we are the ones that are creating gender pay inequities. That's the conundrum. That's why you have to follow the language of this statute that Congress very carefully drafted. And that's why the plaintiff has to establish her prima facie case. And in this case, the plaintiff did not establish her prima facie case. It strikes me, and so happens to us on the panel on the EEOC Maryland case. There, the panel found that the state was exercising discretion in assigning pay. But here, I don't see any discretion. The 75 percent? Well, that's absolutely true. You heard from Provost Hill. The evidence shows that Provost Hill testified that everyone who was moved from administration positions down to faculty were paid $9.12. There was no discretion there. And more importantly, there's a distinguishing issue in the Maryland case. In EEOC versus Maryland Insurance Administration, remember, they were talking about discretion in hiring the individuals. That was where we were dealing with fraud investigators. And the employer, when they had the fraud investigators, they were interviewing them. They decided to set their salary and the steps in their salary based on whether they had licenses and certifications. And that was the discretion that they were using. So the prong of discretion that plaintiffs try to rely on is whether or not in hiring these individuals and setting their starting salaries, whether or not there was discretion there. That's not what we have in this case. There is no hiring and setting starting salaries based on credentials or licenses or professional associations. What we have in this case is a policy, whether Ms. Spencer likes it or not, and whether or not it's a reasonable policy or not. That's not what this court is supposed to decide. But it was a policy, nonetheless, that Virginia State would move its administrators down to faculty salaries at $9.12. A very easily mathematic policy that when you're working nine months, we're going to pay you $9.12 of your salary. Do we have anything further, sir? One last point with respect, Your Honor, to the fact of the affirmative defense. Even though Ms. Spencer did not establish a prima facie case, Judge Hudson didn't stop his analysis there. He gave her the benefit of the doubt and said, let's assume that you did, in fact, establish your prima facie case. Now the burden shifts to the employer, to Virginia State and Dr. Keith Miller, to establish that there was a statutory exemption, and that's the statutory exemption that we've been talking about, that the salaries for Dr. Dial and Dr. Shackelford were set at 75%. The courts indicated that Virginia State clearly established that there was a factor other than sex for the differential in the pay. The courts went further, though, and said, now that you've done your part, Virginia State, what does the evidence say from Ms. Spencer about pretext? Is she suggesting that that 75% was applied with any type of discrimination? That's exactly what, Your Honor, Florida, you were talking about. It was not applied with any discrimination, and in fact, there's no evidence in the record to suggest that it was. Or was this a pretext for something else? And the courts determined that, in fact, it was not. There was no evidence to suggest otherwise. So for these reasons, we ask that Your Honors affirm the lower court's ruling and allow the summary judgment ruling to continue. Thank you. Thank you very much. I want to point out, there's been a lot of talk about unwritten policies. The decision-maker, Weldon Hill, testified that Virginia State had no policies with respect to setting faculty salary, written or unwritten, whatsoever. He testified that he did not make this pursuant to any sort of written policy. He described a process by which the President would arbitrarily, based on perhaps friendship, select a non-academic administrator from time to time to receive. You know, this is a lot more policy-based than salary decisions. Many salary decisions at universities are individually set because of the market forces and the demand for a particular professor at other schools. And they are set because somebody is a particularly gifted teacher, or somebody is a particularly gifted scholar, or somebody is a particularly capable administrator. Here, there was a policy, and it goes beyond how most salaries are set at universities, which are set individually based on appraisals of individual merit by the department head or the dean, and also by the pull of market forces and other universities that are trying to recruit a particular faculty member. So the fact that some salaries are set individually, that's the way it's done in universities across the country. Here, you don't even have that. Here, you have a gender-neutral rule of 9-12. It was applied. Well, that's – so there was no – I mean, the guy who set the salary said there was no such policy. This is a policy that has emerged during the litigation that we've tried to do our best to say, well, what would this policy have looked like if it was – if they were following the norms? Because there was no written policy. The written policy was, in fact, that every attempt should be made for new faculty to receive a salary that approximates the average of their peers at the rank with which they're hired. We have an expert report. There's no way that that was what happened in this case. So there's no unwritten policy. There's no consistent practice. There's no evidence of a single person, non-academic administrator, who received this sort of consideration in hiring of being hired at 9-12s of their prior administrator salaries. So we said, well, what about the practice of higher education? We produced an entire expert report that said non-academic administrators. This is not the practice at universities. This was the same testimony that Hill had, which is this is something that's negotiated at the time of hire as an administrator. It's how it's always worked. The idea of returning, the idea of retreat rights, returning somebody to the faculty is based on the idea that they had been hired to the faculty. They had a dual appointment as an administrator or a previous tenured hire. They go to the – they're terminated as administrator. They can return to the position that they previously had. That's – that is a policy in higher education. However, that doesn't fit into this policy because they were not – they did not have any sort of dual appointment. They had never been granted tenured professorships. They were simply given – they were simply given the 9-12 school. They were given their previous salaries at jobs that had no relationship to their faculty jobs, required completely different skills, completely different qualifications pursuant to no written policy. Contrary to the practice in higher education, we have an entire expert report on that. We have sworn expert testimony on that. We have sworn expert testimony that they were paid, that there's no way to justify their policy if you look at the average of their peers at the rank to which they are hired. So there's nothing in the decision maker in this case testifying. There was no policy that I was acting pursuant to. So the idea – there are – Virginia State could have written and consistently applied a policy that would have justified these salaries, but there was no such policy in place. And with respect to the prima facie case, we have extremely detailed sworn expert testimony from all three of them that they had, that they performed the same duties. The only thing that's missing, the only thing Virginia State says it's missing, is the departmental affiliation. However, we have – none of the cases create that kind of rule that says you can never compare across different departments. And in each case, there was some other factor that justified the pay differential. In this case, these people did not even have terminal degrees in their field, the comparators. So you can't compare it to a case like Stragg or Sobel where the unquestionably did. There was no sort of ultra specialized hiring qualifications. This is somebody who was literally called up the week before classes started and said, hey, here's where you're teaching. And with that, I submit the case. Thank you, counsel. Thank you. Come down, great counsel. Take a brief recess. This honorable court will take a brief recess.
judges: J. Harvie Wilkinson III, Henry F. Floyd, Julius N. Richardson